2008 WY 16

**Steve B. GLENN, Appellant (Plaintiff),**

**v.**

**UNION PACIFIC RAILROAD COM-PANY, a Delaware corporation, Appellee (Defendant).**

**No. S–07–0016.**

Supreme Court of Wyoming.

Feb. 8, 2008.

Representing Appellant: Frederick J. Harrison, Frederick J. Harrison, P.C., Rawlins, Wyoming.

Representing Appellee: Mark C. Hansen, Union Pacific Railroad Company, Denver, Colorado; George E. Lemich, Lemich Law Center, Rock Springs, Wyoming. Argument by Mr. Hansen.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶1] Mr. Glenn was injured while closing the "dump doors" of a rail car in a Union Pacific Railroad Company coal train. He filed suit, claiming that his injury was the result of the railroad's negligence. The district court granted summary judgment in Union Pacific's favor, and Mr. Glenn appealed. We reverse the district court's decision.

## ISSUE

[¶2] The single dispositive issue in this appeal is whether the district court erred in granting Union Pacific's summary judgment motion.

## FACTS

[¶3] Mr. Glenn was employed at the Black Butte coal mine in Sweetwater County. His regular job was working with explosives, but on the night of June 30, 2000, he was asked to work at the coal plant, where a Union Pacific coal train was waiting to be loaded. The train consisted of 102 rail cars, of a type that unload through dump doors in the floors of the cars. When the train arrived at Black Butte, the dump doors on approximately 40 of the cars either were open, or were closed but not securely locked.[1] It seems obvious that coal cannot be loaded into a rail car with open doors. Less obviously, if coal is loaded into a rail car with closed but unlocked doors, the doors might fall open immediately, or later during travel, creating a risk of derailment. It is not uncommon for mine employees to close and lock rail car doors before loading a coal train.[2]

1. It is difficult to determine from the written record just how the closing and locking mechanism works. As nearly as we can tell, the rail car door is hinged on one side, and has a bar running along the other side. The rail car has a hook that catches onto the bar and holds the door closed. According to one description, the hook "has notches where a locking device falls in to hold the hook from popping open." Thus, a door may be closed when the hook has caught the bar, but it is closed and locked only when the locking device has fallen into place in a notch on the hook.

2. A railroad company generally does not load or unload its rail cars. It delivers the rail cars to its customers, and the customers do the loading or unloading. With at least some customers, Union Pacific has contracts specifying that customers who unload the rail cars are obligated to close the doors afterwards. On occasion, however, rail car doors may be left open. The railroad is supposed to inspect for open doors, but only certain employees, including those known as car men, are allowed to close rail car doors. The crews on the trains are generally instructed not to close the doors. Thus, when Union Pacific

[¶ 4] Mr. Glenn had never before closed rail car doors. A co-worker from Black Butte showed him what to do. Using a pry bar, the two proceeded to close the open doors. To lock the closed but unlocked doors, they first opened the doors, then swung them closed again to engage the locking mechanism. Upon opening the closed but unlocked dump doors, they discovered that some of the rail cars contained coking coal (coal processed into small, hard, rounded pellets somewhat like charcoal briquettes) that was left over from the train's previous cargo. According to Mr. Glenn, when they opened the unlocked doors of one particular car, a substantial amount of coking coal spilled out and trapped his right foot in place so that, as he fell backward, his right leg was broken.

[¶ 5] Mr. Glenn filed suit against Union Pacific, claiming that the railroad's negligence caused his injury. Union Pacific moved for summary judgment and the district court granted that motion. Mr. Glenn appeals the district court's decision.

### DISCUSSION

#### Standard of Review

[¶ 6] The district court properly granted summary judgment if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c). We employ a familiar standard when reviewing a district court's grant of summary judgment:

The propriety of a summary judgment is evaluated

by employing the same standards and by examining the same material as the district court. We examine *de novo* the record, in the light most favorable to the party opposing the motion, affording to that party the benefit of all favorable inferences that may be drawn from the record. If upon review of the record, doubt exists about the presence of issues of material fact, that doubt must be re-

solved against the party seeking summary judgment. We accord no deference to the district court's decisions on issues of law.

[*Linton v. E.C. Cates Agency, Inc.*], [2005 WY 63,] ¶ 7, 113 P.3d [26,] 28 [ (Wyo. 2005) ] (citations omitted). "Summary judgment is not favored in a negligence action and is, therefore, subject to more exacting scrutiny. We have, however, affirmed summary judgment in negligence cases where the record failed to establish the existence of a genuine issue of material fact." *Jones v. Schabron*, 2005 WY 65, ¶ 9, 113 P.3d 34, 37 (Wyo.2005) (citations omitted).

*Jacobson v. Cobbs*, 2007 WY 99, ¶ 7, 160 P.3d 654, 656–57 (Wyo.2007).

[¶ 7] In *Natrona County v. Blake*, 2003 WY 170, ¶ 6, 81 P.3d 948, 951 (Wyo.2003), we listed the following elements of a negligence claim:

(1) The defendant owed the plaintiff a duty to conform to a specified standard of care, (2) the defendant breached the duty of care, (3) the defendant's breach of the duty of care proximately caused injury to the plaintiff, and (4) the injury sustained by the plaintiff is compensable by money damages.

Mr. Glenn correctly recited these elements in his district court pleadings, and our task here is to determine whether the district court was correct in ruling that there were no genuine issues of material fact with regard to these elements.

#### Duty Owed

[¶ 8] Wyoming law has long recognized that a railroad has a duty "to exercise ordinary and reasonable care and prudence in the operation of its railway, and to take those usual, ordinary, precautionary measures which a prudent, reasonable person would take." *Union Pacific Railway Co. v. Gilland*, 4 Wyo. 395, 402, 34 P. 953, 955 (1893). When this duty is violated and injury is caused, a railroad may be held liable. For

---

delivers an empty train to a customer for loading, and some rail car doors have been left open, it is not uncommon for the customer's employees to close the rail car doors. By observing this

industry practice, we do not intend to comment on any legal obligations or duties of the railroad or its customers, only to provide context for this case.

example, when the end door of a rail car fell and hurt an employee as he was unloading cargo, and there was evidence that the fastening hooks had been worn and loose, we upheld the jury's verdict that the railroad was negligent. *Chicago & N.W. R.R. v. Ott,* 33 Wyo. 200, 237 P. 238 (1925). In *Chicago, B. & Q. R.R. v. Murray,* 40 Wyo. 324, 338, 277 P. 703, 707 (1929), we explained that the railroad's duty "seems not unlike the duty of the owner of premises to an invitee. The owner must use care to keep the premises reasonably safe for the protection of the invitee." [3]

■■■ [¶ 9] Union Pacific acknowledges that it has a duty to perform a reasonable inspection of its rail cars, and either remedy or warn its customers about dangerous conditions. This is supported by numerous cases from other jurisdictions. *See, e. g., Rouillier v. Illinois Cent. Gulf R.R.,* 886 F.2d 105, 108 (5th Cir.1989); *Hedgcorth v. Missouri Pacific R.R. Co.,* 592 S.W.2d 473, 475 (Mo.App.1979); *Stickle v. Union Pacific R.R. Co.,* 122 Utah 477, 480, 251 P.2d 867, 868–69 (1952); *and cases cited in* 75 C.J.S. *Railroads* § 1193 (2002) and 99 A.L.R.2d 165, § 2. In this instance, the customer was Black Butte, and the district court correctly noted that Black Butte, as Mr. Glenn's employer, had a duty to provide a safe place to work. *See, e.g., Mellor v. Ten Sleep Cattle Co.,* 550 P.2d 500, 503 (Wyo.1976). However, the customer's duty to provide a reasonably safe workplace does not supplant the railroad's duty to provide reasonably safe rail cars. As explained in *Chicago, R.I. & P.R. Co. v. Williams,* 245 F.2d 397, 402 (8th Cir. 1957):

> It is a carrier's duty to use ordinary care to deliver cars reasonably safe for the use of shippers and their employees while the cars [are] being loaded or unloaded. The

employer's duty to provide for the employee a safe place in which to work may be added in the circumstances but does not supplant the carrier's duty. The carrier cannot impose this duty to furnish cars reasonably safe on the shipper, to its own relief from liability for injuries to an employee of the shipper.

(Internal citation omitted.) Having reviewed the cases from Wyoming and other jurisdictions, we conclude that Union Pacific owed Mr. Glenn a duty to provide rail cars that were reasonably safe for their intended use.

### Duty Breached

■ [¶ 10] Our review of the record reveals sufficient evidence to create a genuine dispute about whether Union Pacific breached its duty to provide reasonably safe rail cars to the Black Butte coal mine on the night Mr. Glenn was injured. There is evidence that at least one rail car contained a substantial amount of coking coal left over from its previous cargo. Mr. Glenn's deposition testimony indicates that this was a dangerous condition. A co-worker who assisted in loading Mr. Glenn onto the ambulance testified that the coking coal on the ground caused him concern about his footing and his own safety.

[¶ 11] As expressed by Union Pacific, its duty was to inspect for dangerous conditions and remedy or warn about them. The fact that 40 out of 102 rail cars in this train arrived with their doors open or unlocked is evidence that no inspection had been performed. One witness, an experienced railroad employee who had retired from Union Pacific, agreed that if a train showed up at the mine with 40 cars with open doors, then somebody along the way "hasn't done their job." Asked if he meant that somebody on the railroad had not done his job, he an-

---

**3.** The latter two Wyoming cases involved the railroad's liability to its own employees. Many of the cases relied upon by Mr. Glenn, such as *Boston & Maine R.R. Co. v. Sullivan,* 275 F. 890, 893 (1st Cir.1921), similarly involve a railroad's liability to its employees. Union Pacific asserts that such cases are inapplicable because a railroad's liability to its employees is governed, not by the common law, but by the Federal Employers Liability Act, 45 U.S.C. § 51, *et seq.* (FELA). However, a railroad's liability under FELA is explicitly based on negligence, 45 U.S.C. § 51, and with regard to the safety of rail cars, it appears that a railroad owes the same duty to its own employees as it does to non-employees who are authorized to load, unload, or work on rail cars. *See, e.g., Landes v. Thompson,* 235 Mo.App. 772, 148 S.W.2d 78 (1941). Accordingly, while FELA cases do not apply directly, they still provide useful guidance in negligence claims against the railroad.

swered, "that's certainly the way it looks if a train crew brought it out with 40 cars open."

[¶ 12] Union Pacific could have remedied the potentially dangerous condition by emptying the rail cars, or it could have warned Mr. Glenn that the rail cars might contain a substantial amount of coking coal. There is no dispute that it did neither. The district court noted, however, that this was not the first rail car Mr. Glenn had opened, and coking coal had fallen from previous rail cars as well. On this basis, the district court said that Mr. Glenn "had actual notice of the presence of coke in the cars." The district court relied on *Hedgcorth*, 592 S.W.2d at 475, for the proposition that Union Pacific had no duty to warn Mr. Glenn about a dangerous condition that was obvious, or of which he was already aware.

[¶ 13] *Hedgcorth* is not consistent with Wyoming law. Under our obvious danger rule, there is no duty to correct or warn about "an obvious and known danger resulting from natural causes." *O'Donnell v. City of Casper*, 696 P.2d 1278, 1282 (Wyo. 1985). That rule is limited to dangers resulting from natural causes such as ice, snow, or wind. *Id.* at 1283; *Valance v. VI–Doug, Inc.*, 2002 WY 113, ¶¶ 10–12, 50 P.3d 697, 701–03 (Wyo.2002). For non-natural conditions, even if the danger is "perfectly obvious to the plaintiff," it is "the jury's function under the comparative negligence statute to compare the plaintiff's negligence with that of the defendant." *Stephenson v. Pacific Power & Light Co.*, 779 P.2d 1169, 1180 (Wyo.1989).

[¶ 14] Our review of the evidence suggests that the allegedly dangerous condition was not so obvious. Mr. Glenn testified that, prior to the accident, only a couple of other rail cars had to be opened and then closed. Coking coal had fallen from them, but in Mr. Glenn's version of the event, substantially more spilled out of the rail car involved in his injury. His co-worker, the only other witness to the event, agreed that more coking coal spilled from this car than from the previous cars. Given this evidence, it is up to the jury to decide if Mr. Glenn was negligent in failing to perceive an obvious danger, and to compare his negligence, if any, to Union Pacific's negligence, if any.

### Proximate Cause

[¶ 15] We have said that the "ultimate test of proximate cause is foreseeability of injury." *Turcq v. Shanahan*, 950 P.2d 47, 51 (Wyo.1997). We have also said that "[p]roximate cause is usually a question of fact, reserved for the trier of fact's determination unless the evidence is such that reasonable minds could not disagree." *Duncan v. Town of Jackson*, 903 P.2d 548, 553 (Wyo. 1995). Reasonable minds could determine that it was foreseeable that a rail car containing a substantial amount of coking coal could cause injury to someone like Mr. Glenn who opened the doors in order to lock them.

[¶ 16] Throughout this litigation, Mr. Glenn has emphasized Rule 1.35 of Union Pacific's General Code of Operating Rules, which provides as follows:

> Be sure dump doors on cars are closed after a load is dumped. If car must be moved short distances with the dump doors open, make sure the doors and chains will clear tracks and crossings.

In considering this rule, the district court noted that Mr. Glenn's injury was not caused by a rail car with open doors. Mr. Glenn could still have been injured even if the railroad had closed all the rail car doors. Therefore, the district court reasoned, even if Union Pacific did not comply with Rule 1.35, that was not a proximate cause of Mr. Glenn's injury. Limited as it was to the issue of open doors, the district court's reasoning was correct. However, the railroad's duty was not to provide rail cars with closed doors, but to provide rail cars that were reasonably safe for their intended use. It is the alleged breach of that duty that must be evaluated as the proximate cause of Mr. Glenn's injury.

### Compensable Injury

[¶ 17] There appears to be no dispute that Mr. Glenn suffered an injury "compensable in damages." That brings us to the final conclusion that sufficient evidence exists in the record to create genuine issues of material fact with regard to each of the four elements of Mr. Glenn's negligence claim

against the railroad. The district court erred in granting summary judgment in favor of Union Pacific.

[¶ 18] We reverse and remand to the district court for further proceedings consistent with this opinion.